UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PREMIUM MERCHANT FUNDING 26, LLC,<br><br>                              Plaintiff,<br><br>                    v.<br><br>SONATA CONSTRUCTION LLC, *et al.*,<br><br>                              Defendants. | No. 25-CV-1086 (KMK)<br><br><u>OPINION & ORDER</u> |

<u>Appearances</u>:

Ariel Bouskila, Esq.
Berkovitch & Bouskila, PLLC
Pomona, NY
*Counsel for Plaintiff*

Hillel I. Parness, Esq.
Parness Law Firm, PLLC
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Premium Merchant Funding LLC ("PMF" or "Plaintiff") brings this suit against Sonata Construction LLC ("Sonata") and Sonata's guarantor George Atala ("Atala") (collectively, "Defendants"), seeking to collect what Plaintiff argues it is owed under a financing agreement. Defendants counterclaimed, arguing the financing agreement is a cover for a usurious loan. After Plaintiff circulated lien notices to Defendant's clients during the pendency of the Action, Defendants moved for a preliminary injunction barring Plaintiff from circulating additional notices. Before the Court is Defendants' motion for a preliminary injunction on their counterclaims and Plaintiff's motion to dismiss the counterclaims. For the following reasons, the

Court grants Defendants' Motion for a Preliminary Injunction, and grants in part and denies in part Plaintiff's Motion to Dismiss the counterclaims.

I.  Background

A.  Factual Background

1.  The Agreements

The following facts are drawn from Defendants' Counterclaims and the Parties' contracts[1] and accepted as true for the purposes of the Motion.  *See Fehn v. Grp. Long Term Disability Plan for Emps. of JP Morgan Chase Bank*, No. 07-CV-8321, 2008 WL 2754069, at *2 (S.D.N.Y. June 30, 2008) ("When deciding a 12(b)(6) motion to dismiss a counterclaim, the Court must take as true the facts as alleged in the counterclaim, and may consider documents incorporated in the counterclaim by reference, matters of which judicial notice may be taken, or documents that the counter-plaintiff relied on in bringing suit.").  Plaintiff and Defendants entered into three agreements ("the Agreements") on September 9, 2024; September 18, 2024; and September 24, 2024.  (Am. Answer & Countercls. ¶ 52 (Dkt. No. 12).)   The Agreements were each styled as "merchant cash advance" payments and each had the same structure, with varying rates and amounts.  (*Id.* ¶ 53.)  A "merchant cash advance," or "MCA," is a financing arrangement where a company sells certain receivables (*i.e.*, future expectations of income based on what the company's clients or customers owe it) to a financer.

---

[1] The Court may consider the relevant contracts, which are attached as exhibits to Plaintiff's submissions, whose authenticity Defendants do not contest, and which Defendants repeatedly reference in their Answer and Counterclaims.  *See Kalyanaram v. Am. Ass'n of Univ. Professors at the New York Institute of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) ("In ruling on a 12(b)(6) motion . . . a court may consider the complaint as well as any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference." (quotation marks and citation omitted)).

In the Agreements, Defendants represented to Plaintiff that they had a certain amount of receivables, the "purchased amount." (Notice of Removal, Ex. 1, ¶ 6 ("Compl.") (Dkt. No. 1).) The purchased amount was not tied to any particular revenue stream or client account, nor did the Agreements identify one. (*See, e.g.*, Mot. to Dismiss, Ex. A ("1st Agreement") at 2, 16 (Dkt. No. 18-2).) Plaintiff would buy those receivables for some smaller amount, the "purchase price." (*Id.* at 2, 23.) Every week, Plaintiff would deduct a specified amount that the Agreements represented was a percentage of Defendants' estimated weekly receivables from Defendants' bank account. (*Id.* at 2; *id.* at 16 (authorizing Plaintiff to "initiate recurring entries" to the account).)

If Defendants' receivables were lower in any given week than the presumptive deduction, the Agreements provided a process for seeking "reconciliation," *i.e.*, squaring what Plaintiff collected with what Defendants took in. (*Id.* at 4 ("Provided that no Event of Default (as defined below) has occurred, either Merchant or PMF may request, not more than once per calendar month, a reconciliation of the Remittance Amount [*i.e.*, the weekly withdrawal] against the amount of receipts collected by PMF[.]").) Failure to submit a request for reconciliation within the first ten days of a month waives the merchant's rights to reconciliation for the preceding calendar month. (*Id.* ("Subject to PMF's receipt of a proper and timely request for an Account Reconciliation, PMF shall reconcile the above-stated amounts either by crediting or debiting the Account . . . so that the amounts paid by Merchant to PMF for the given month do[] not exceed the Specified Percentage [*i.e.*, the agreed estimate of the receivables].").) "For any month in which no Account Reconciliation is requested . . . the Remittance Amount shall be presumed to reflect accurately the Specified Percentage." (*Id.*) "Notwithstanding anything contained herein to the contrary . . . upon occurrence of an Event of Default, the daily amount payable to PMF

3

shall equal one hundred percent (100%) of all receipts collected by Merchant." (*Id.*)  The

following is a non-exhaustive list of events of default under the Agreements:

- o  Merchant fails to respond to a request by PMF Funding (or its agent) for updated bank statements within 3 business days or otherwise refuses to honor a Reconciliation request, thereby preventing PMF from conducting a Reconciliation;
- o  Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false, or misleading in any material respect when made;
- o  The sending of notice of termination by Merchant or verbally notifying PMF of its intent to breach this Agreement;
- o  Merchant shall transfer or sell all or substantially all of its assets;
- o  Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;
- o  Merchant shall use multiple depository accounts without the prior written consent of PMF;
- o  Merchant shall change its depositing account without the prior written consent of PMF;
- o  Merchant shall close its depositing account used for ACH debits without the prior written consent of PMF;
- o  Merchant's bank returns a code other than NSF cutting PMF from its collections;
- o  Merchant causes its account to stop allowing PMF to withdraw the Estimated Payment from the account and (a) Merchant does not notify PMF by written email, within two business days of a valid reason for causing the account to stop clearing payments, and (b) Merchant has not requested a Reconciliation.

(*Id.* at 8.)  "If an Event of Default occurs, PMF will enforce its rights against the Guarantors of

this transaction."  (*Id.*)  Bankruptcy alone does not trigger a default.  (*Id.* at 3 ("Merchant going

bankrupt . . . in and of itself, does not constitute a breach[.]").)  But the Parties agree that "PMF

is not required to file a motion for relief from a bankruptcy action automatic stay to realize on

any of the Secured Assets."  (*Id.* at 13.)  The Agreements also include a "Security Agreement

and Guarantee," in which Defendants "grant[ed] to [Plaintiff] a security interest and lien upon

. . . all accounts, chattel paper, documents, equipment, general intangibles, instruments, and

inventory," and proceeds, as defined in the UCC (which includes receivables), "all funds at any

time in the Merchant's and/or Guarantor(s) Account, regardless of the source," "present and future Electronic Check Transactions," and "any amount which may be due to [Plaintiff] under" the Agreements. (*Id.* at 12–13.)

In these three agreements, Defendants were paid $150,000, $126,000, and $525,000, for, respectively, $229,500, $191,520, and $798,000 of "receivables." (Am. Answer & Countercls. ¶ 68.) The weekly payments were, respectively, $14,343.75 (represented as an "estimat[ion]" of "7.87% of [Defendants'] weekly receivables"), $12,768.00 (a purported estimate of 7.71% of Defendants' weekly receivables), and $34,695.66 (a purported estimate of 19.59% of Defendants' weekly receivables). (1st Agreement 2; Mot. to Dismiss, Ex. B ("2d Agreement") at 2 (Dkt. No. 18-3); Mot. to Dismiss, Ex. C ("3d Agreement") at 2 (Dkt. No. 18-4).) Comparing the "purchased amount" to the estimated receivables purchased in each Agreement, Defendants calculate that the effective interest rates in each Agreement were "approximately 49.9%," with effective annualized rates of well over 100%. (Am. Answer & Countercls. ¶ 61; Defs.' Mem. in Opp. to Mot. to Dismiss ("Defs.' Mem.") (Dkt. No. 21).)

### 2. The Default

Defendants and Plaintiff first entered into three financing agreements *not* at issue here on April 16, 2024; May 15, 2024; and June 25, 2024. (Am. Answer & Countercls. ¶ 59.) Under these previous agreements, Plaintiff "purchased" $299,800, $449,700, and $637,075 of "receivables" for, respectively, $200,000, $300,000, and $425,000. (*Id.* ¶¶ 60–61.) Defendants paid their balances in full on each of these agreements within three, five, and twelve weeks. (*Id.* ¶ 63.) Covering Defendants' payments on these agreements put Defendants in "extreme . . . financial hardship, forcing them to seek additional funding" from Plaintiff. (*Id.* ¶¶ 63–64.)

Defendants accordingly signed the three Agreements discussed above "immediately after the previous ones were repaid." (*Id.* ¶ 64–69.)

Defendants allege a pattern of "high-pressure sales tactics" preceded the Agreements. (*Id.* ¶ 81.)  For example, PMF employees represented that the MCA was an offer of $703,000 with a "payback" of $773,000, and insisted Defendants "get the ball rolling" after Defendants expressed skepticism that the arrangement was "too good to be true." (*Id.*)  Other employees sought to instill a sense of urgency in Defendants. (*Id.* (an employee "pressuring Atala to sign quickly"); *id.* (an employee "sen[ding] multiple emails to Atala, indicating that [the employee] had not heard back, and that PMF could 'fund within 24-48 hours'"); *id.* (an employee writing to Defendants, "You said you want a 12 month deal I can easily get you that by tomorrow morning").  And Plaintiff's employees frequently represented the funding arrangement Defendants sought as a loan. (*Id.* ("[An employee] told Sonata it would receive a 'loan[.]'"); *id.* ("I received your loan inquiry from PMF Processing Department . . . We're excited for the opportunity to find the loan that fits your needs!").)

Defendants, "[f]acing persistent financial hardship" in part from their obligations under the prior agreements, were unable to make their payments on the Agreements at issue in this case. (*Id.* ¶ 71.)  They accordingly "engaged a debt consolidation company . . . to communicate with [Plaintiff] and attempt to restructure [Defendants'] obligations." (*Id.*)  Plaintiff "disregarded these efforts," "stat[ing] that [it] would not work with the debt consolidation company and continu[ing] [to] extract[] payments, knowing there were no available receivables" incoming to Defendants. (*Id.* ¶¶ 72–73.)  Plaintiff then filed this lawsuit to collect on the Agreements. (*Id.* ¶ 73.)

    B.  Procedural History

Plaintiff filed the Complaint in New York Supreme Court, Rockland County, on January 15, 2025.  (Compl.)  Defendants removed the case to this Court on February 6, 2025.  (Notice of Removal.)  Defendants served their answer and counterclaims on February 13, 2025, (Answer & Countercls. (Dkt. No. 4)), and amended them on March 28, 2025, (Am. Answer & Countercls.).  Plaintiff moved to dismiss the counterclaims on May 22, 2025.  (Mot. to Dismiss (Dkt. No. 18); *see also id.* Ex. 7 ("Pl.'s Mem.") (Dkt. No. 18-7).)  Defendants responded to the motion on June 19, 2025.  (*See* Defs.' Mem. in Opp. to Mot. to Dismiss ("Defs.' Mem.") (Dkt. No. 21).)  Plaintiff filed a reply on July 7, 2025.  (First Reply Mem. of L. ("Reply") (Dkt. No. 22).)  On October 1, 2025, Defendants moved for a temporary restraining order and preliminary injunction after Plaintiff circulated new UCC lien notices to Defendants' creditors.  (Proposed O.S.C. with Emergency Relief (Dkt. No. 23).)  The Court granted a temporary restraining order, (Order (Dkt. No. 27)), and at the hearing on Defendants' request for a preliminary injunction, reserved judgment pending supplemental briefing, (Dkt. (Minute Entry dated Nov. 17, 2025)).  Defendants submitted supplemental materials on November 24, 2025.  (Supp. Decl. of George Atala (Dkt. No. 38).)  Plaintiff responded on December 9, 2025.  (Decl. of Ariel Bouskila (Dkt. No. 39).)

## II.  Discussion

### A.  Standard of Review

#### 1.  Motion to Dismiss

A motion to dismiss a counterclaim is subject to "the same standards as a motion to dismiss a complaint." *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 175 (S.D.N.Y. 2021).  The Supreme Court has held that although a pleading "does not need detailed factual allegations" to survive a motion to dismiss, a claimant's "obligation to provide the grounds of

[its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration adopted and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a claimant must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a claimant has not "nudged the[ ] claims across the line from conceivable to plausible, the[ ] [claim] must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a . . . motion to dismiss [a claim or counterclaim], a judge must accept as true all of the factual allegations contained in the [counterclaims]," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the [non-movant]," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the [counterclaims], in documents appended to . . . or incorporated in [them] by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (noting that a district court should consider only the complaint, documents appended to the complaint or incorporated by reference, and matters judicial notice can be taken of in ascertaining facts for a motion to dismiss).

2.  Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (emphasis and quotation marks omitted)).  "Preliminary injunctive relief is designed to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits."  *Williams v. Rosenblatt Sec., Inc.*, 136 F. Supp. 3d 593, 616 n.11 (S.D.N.Y. 2015) (quotation marks omitted).  "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."  *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (citation omitted).

"A party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo*, 784 F.3d 887, 895 (2d Cir. 2015) (alteration adopted and quotation marks omitted). A preliminary injunction may be "warranted on the strength of the[] first two factors alone." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020).

### B. Analysis

#### 1. Motion to Dismiss

##### a. Fraudulent Inducement and Common-Law Fraud

Defendants' first cause of action is for fraudulent inducement. (Am. Answer & Countercls. ¶¶ 74–89.) They allege Plaintiff misrepresented the Agreements "as loans and lines of credit when, in reality, they were high-interest MCAs;" misrepresented terms of the Agreements, including "stating that no interest was charged;" and making "false assurances regarding repayment flexibility," while "fail[ing] to disclose excessive fees, high interest rates, and the true financial impact of the Agreements." (Am. Answer & Countercls. ¶¶ 75–78.) Plaintiff argues Defendants fail to plead their fraud claims with particularity, that Defendants could not have relied on pre-contract statements that were contradicted by the plain terms of the contracts, and that Defendants failed to prove damages from any breach. (Pl.'s Mem. 11–14.)

"To state a claim for fraudulent inducement [under New York state law], there must be a knowing misrepresentation of material present fact, which is intended to deceive another party

10

and induce that party to act on it, resulting in injury." *Gosmile, Inc. v. Levine*, 915 N.Y.S.2d 521, 524 (App. Div. 2010). Fraudulent inducement also carries a reliance element. *See Fed.-Mogul Corp. v. UTi, U.S., Inc.*, 45 N.Y.S.3d 401, 404 (App. Div. 2017) ("To be viable, a fraudulent inducement claim must demonstrate justifiable reliance on the false representation." (citation omitted)).

The Court focuses on that element in dismissing this counterclaim. Each representation Defendants point to is either disclaimed in the terms of the contract or is accurately stated therein. For example, the Agreements disclaim that they are interest-bearing loans rather than MCAs, and Defendants do not allege that the fees or amounts in the contract were disguised or any different than what the plain text of the Agreements indicates.[2] (*See, e.g.*, 1st Agreement 5 (stating the Agreements are "not intended to be, nor shall [they] be construed as a loan from PMF to Merchant"); *id.* ("In no event shall [payments to Plaintiff] be deemed as interest hereunder[.]"); *id.* at 4 (explaining the reconciliation process for repayments); *id.* at 15 (explaining the "fee structure").) Where an agreement does so, there is no claim for fraudulent inducement based on those representations. *See Moore v. Cohen*, 548 F. Supp. 3d 330, 343 (S.D.N.Y. 2021) ("Under New York law, when a contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be

---

[2] Whether as a matter of New York law the Agreements *are* loans is a separate question the Court addresses later in this Opinion. What matters for the purpose of Defendants' fraud claim is whether they entered into these transactions reasonably relying on any representation that they were loans. Whether a transaction is a loan depends on the substance of the transaction; whether a borrower could reasonably rely on an earlier representation that a transaction was a loan depends on what the lender told the borrower and when. But if the "misrepresentation" is that the Agreements are loans, and they are, in fact, loans, then there could not have been fraudulent inducement—Plaintiff's employees revealed the game to Defendants, who played anyway. (*See* Am. Answer & Countercls. ¶ 81 ("Sonata responded[,] 'My friend this is too good to be true.'").)

allowed to claim that he was defrauded into entering the contract in reliance on those representations." (citation, emphasis, and quotation marks omitted)); *id.* ("This requires that the agreement 'contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim.'" (quoting *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993))).

And even if there were reasonable reliance, Defendants do not allege that the misrepresentations that induced the contract went to a "present fact." *Gosmile, Inc.*, 915 N.Y.S.2d at 524. The New York Court of Appeals has distinguished between a "representation of present fact" that is collateral to a contract, which can be actionable as fraudulent inducement, and a "mere promissory statement as to what will be done in the future," which is not. *Deerfield Commc'ns Corp. v. Chesbrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004 (N.Y. 1986). Defendants point to no "[mis]representation of present fact" here, *id.*—rather, they point to claims *about the yet-unseen and unsigned Agreements*, like their fees and how to characterize them, (Am. Answer & Countercls. ¶¶ 75–78). For fraudulent inducement, that will not do. *See Cronos Grp. Ltd. v. XComlP, LLC*, 64 N.Y.S.3d 180, 191 (App. Div. 2017) ("[A] false promise is actionable as fraud only if the promised performance is outside the terms of any contract between the parties.").

Accordingly, the Court dismisses the counterclaim for fraudulent inducement. For the same reasons, the Court dismisses the counterclaim for common-law fraud, (Am. Answer & Countercls. ¶¶ 144–169), which is premised on the same misrepresentations—the only misrepresentations the common-law fraud counterclaim alleges with something approaching the requisite particularity, *see* Fed. R. Civ. P. 9(b), concern the Agreements' costs, marketing, and reconciliation provisions. (*See* Am. Answer & Countercls. ¶ 152 ("Had the Sonata Parties been fully informed of the true nature of these contracts, including their high costs, the lack of

12

flexibility in repayment, and the manipulative renewal process, [they] would not have agreed to the terms.").)  *See Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 369 (S.D.N.Y. 2020) ("A claim for fraudulent inducement must satisfy the same elements as a claim for common law fraud.")

### b.  Criminal Usury

Defendants next assert a claim premised on New York's prohibitions on criminal usury and seek declaratory relief that the Agreements are void *ab initio*.  (*See* Am. Answer & Countercls. ¶¶ 90–98.)  As relevant here, New York deems it a class-C felony for "a person . . . not being authorized or permitted by law to do so" to "knowingly charge[], take[] or receive[] any . . . interest on [a] loan or forbearance of any money . . . at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period and . . . the actor's conduct was part of a scheme or business of making or collecting usurious loans."  N.Y. Penal L. § 190.42.  And the same conduct is a class-E felony when the "scheme or business" element of § 190.42 is not met.  *See id.* § 190.40.

The threshold question, which also underlies Counts II, III, and IV of the Counterclaims,[3] is whether the MCAs are criminally usurious loans by another name, because the criminal usury laws apply only to loans.  *See Funding Grp., Inc. v. Water Chef, Inc.*, 852 N.Y.S.2d 736, 742 (Sup. Ct. 2008) ("[I]f the transaction is not a loan or forbearance of money there can be no usury, regardless of how[] unconscionable the contract may be.").

---

[3] That criminal usury, Count II, depends on this determination is clear enough.  Count III, tortious interference, depends in part on whether the loan is usurious because if the loan were improper, so would be Plaintiff's UCC lien notices to Defendants' customers.  (*See* Answer & Countercls. ¶¶ 99–109.)  Count IV, asserting RICO violations, depends on the loans being criminally usurious because that would establish a RICO predicate offense, as explained below. (*See id.* ¶¶ 110–25.)

In disputing whether the Agreements are loans, the Parties focus on the test articulated in a Second Department opinion, *LG Funding*. That test determines whether a transaction is a loan based on the presence of some combination of three features—"(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 313 (App. Div. 2020); *see also Principis Cap., LLC v. I Do, Inc.*, 160 N.Y.S.3d 325, 326 (App. Div. 2022) (same). This test, however, has never been endorsed by the New York Court of Appeals, and it is the Court of Appeals's view—and this Court's predictions of how it would rule in a given case—that this Court must apply in interpreting state law. *See Engel v. CBS, Inc.*, 182 F.3d 124, 125 (2d Cir. 1999) ("We . . . are bound to apply New York Law as determined by the New York Court of Appeals[.]"); *see also Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005) ("[W]e must carefully predict how the state's highest court would resolve the uncertainties that we have identified.").

Instead, New York's highest state court takes a functional view of whether a transaction is a loan, considering "substance—not form," and when it last weighed in on the question, the Court of Appeals discussed none of the factors in *LG Funding* and like cases. *Adar Bays, LLC v. GeneSYS, ID, Inc.*, 179 N.E.3d 612, 622 (N.Y. 2021); *see also Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247–48 (S.D.N.Y. 2022) (concluding the three *LG Funding* factors "are far from dispositive," remarking that other departments have analyzed MCA contracts without relying on these factors, and noting even the Second Department does not conduct a "mechanical application of these factors"). Rather, "[s]everal factors help distinguish loans[:] . . . First, parties who are not directly exposed to market risk . . . are likely to

be lenders, not investors.  Additionally, context, such as whether a party applied to the other for a loan or had outstanding, separate transactions, helps to distinguish between intent to borrow and intent to exchange in a joint transaction or exchange money for some other reason."  *Adar Bays*, 179 N.E.3d at 622 (citation omitted).  Another court in this District recently described the inquiry from *Adar Bays*—and what the Second Department was fundamentally concerned with in *LG Funding*—as "how the contract at issue allocates risk between the parties."  *Haymount Urgent Care PC*, 609 F. Supp. 3d at 247.

Accordingly, this Court looks at the "substance" of the transaction.  *Adar Bays*, 179 N.E.3d at 334.  In substance, Defendants have sufficiently alleged that the transactions at issue are not true cash advances—and if they are not cash advances, it is difficult to conceive of any other way to describe them than as loans.  Start with the *Adar Bays* factors.  The Counterclaims specifically allege Defendants' intent in entering into the Agreements, and Plaintiff's intent in soliciting Defendants' business, was for Defendants to borrow money from Plaintiff.  (Am. Answer & Countercls. ¶¶ 80–81 (describing Plaintiff as "advertising long-term loans" to Defendants and cataloguing examples, including references to Plaintiff's products as "Term Loan (Unsecured)," the Agreements as consisting of "Amount" and "Payback," listing Plaintiff's offerings and including "lines of credit, term loans, [and] SBA loans" but excluding MCAs, and referring to Defendants' "loan inquiry").)  More importantly, although the Agreements nominally represent that Plaintiff bears the risks of a slowdown, (*see* 1st Agreement 3), in substance, they leave Defendants bearing market risk, making Plaintiff more a lender than an investor or purchaser of an asset.  They do this by requiring payments of a pre-set (or "presumed," (*id.* at 4)) amount that are drawn weekly by Plaintiff from Defendants' account, and as explained above, are not tied to any particular revenue stream (indeed, there is no explanation

15

for their basis).  (*See, e.g.*, 1st Agreement 2, 16.)  If the market for Defendants' services slows down such that they are not paid by their customers enough to top up their account and the "recurring" withdrawal, (*id.* at 16), bounces without a reason Plaintiff deems "valid," Plaintiff can accelerate the full amount owed, recover from the personal guarantor they required for the "advances," sue the guarantor, and recover on the security interests.  (*See* 1st Agreement 4–13.)  This operates to shield Plaintiff from market risk.  *See Lateral Recovery, LLC v. Cap. Merchant Servs., LLC*, 632 F. Supp. 3d 402, 456 (S.D.N.Y. 2022) (holding that an agreement was a loan where, among other things, "if the merchant declares bankruptcy, the funder still does not take on any risk" because "the guarantor's obligations" kick in during bankruptcy, though unlike here, bankruptcy was also an explicit event of default).  In short, Defendants' protection of downside risk differs little from that of a creditor.  *Cf. In re LightSquared Inc.*, No. 12-12080, 2014 WL 5488413, at *7 (Bankr. S.D.N.Y. Oct. 30, 2014) ("[H]olders of equity interests are attempting to leapfrog up the capital structure over secured creditors, inappropriately shifting downside risk to secured creditors that is properly borne by equity.").  Under *Adar Bays'* terms, that is enough to conclude these agreements are loans—they are in substance not *purchases* of receivables, but *loans secured by receivables*.

The *LG Funding* factors only strengthen this conclusion.  First, while the Agreements have reconciliation provisions—*i.e.*, allowing Defendants to match their weekly payments to the actual amount of their receivables—Defendants plausibly allege they border on illusory. Although Plaintiff describes the provisions as mandatory, largely hanging its hat on the provisions' use of the word "shall," the agreements only mandate reconciliation after a litany of conditions that appear to afford Plaintiff considerable discretion.  For example, the reconciliation provisions limit Defendants to seeking reconciliation ten days a month, and depend on the

submission of a "proper and timely request for an Account Reconciliation" without explaining what would make a request "proper," and the reconciliation provisions disappear if Defendants default, including by failure to make the "estimated [weekly] payment"—the sort of event that might prompt a request for reconciliation in the first place—without a reason Plaintiff deems "valid," another unexplained term.  (1st Agreement 4, 8.)  *See Cap. Merchant Servs., LLC*, 632 F. Supp. 3d at 461 (holding where a reconciliation provision is "contingent upon the merchant producing satisfactory documentation to the funder," as here, this "provid[es] the funder a ready means to deny reconciliation," "a feature that other courts have observed places the risk of default on the merchant"); *Haymount Urgent Care PC*, 609 F. Supp. 3d at 249 ("It is readily apparent how the lender could use this contractual right to obtain from the merchant further documentation as a procedural pretext for denying reconciliation.").  Second, "[w]hile none of the MCA agreements have definite terms spelled out in the texts of those contracts, the expected duration of the repayment period is readily calculable, since the merchant's total repayment amount due is known, as is the [weekly] remittance amount"—here, in round numbers: 16 weeks for the first Agreement, 15 for the second, and 23 for the third.  *Haymount Urgent Care PC*, 609 F. Supp. 3d at 248 n.5; *see also id.* ("While that remittance is subject to reconciliation, and thus to the extension of the loan term, 'the contingent nature of potential future payments do[es] not remove the loan from the scrutiny of the usury law.'" (quoting *Adar Bays*, 37 N.Y.3d at 338) (alterations adopted)); *Lateral Recovery LLC v. Queen Funding, LLC*, No. 21-CV-9607, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022) ("However, a de facto fixed term plausibly exists. The period of payment can be easily calculated by dividing the amount [the plaintiff] owes by the amount of daily payments.").  (*See, e.g.*, 1st Agreement 4–13.)  Finally, there is recourse if Defendants declared bankruptcy—while bankruptcy is not an event of default, the Agreements

exempt Plaintiff from the automatic stay of litigation against the debtor that ordinarily obtains in bankruptcy. (*See* 1st Agreement 13.) And the clearest recourse Plaintiff has even when Defendants are bankrupt is the ability to recover against the guarantor. Plaintiff even cites this as a reason other courts have found the bankruptcy factor satisfied, seemingly not realizing Plaintiff's own Agreements are much the same and that one of the Defendants *is* the guarantor. (Reply 3 ("The agreement in *Fleetwood* provided that the funder had [recourse] against the guarantors in the [e]vent that the Merchant filed for bankruptcy[.]").) *See Cap. Merchant Servs., LLC*, 632 F. Supp. 3d at 458 ("The effect of these features, when considered as a whole, is to eliminate any risk on the part of the funder and to give it the right to repayment under all circumstances.").

This conclusion should not be read to suggest the Court would consider *every* merchant cash advance a loan. Other courts have described that inquiry as a fact-bound one, as this Court has done here, and have reached different conclusions on different facts. *See, e.g.*, *True Bus. Funding LLC v. Sonata Constr. LLC*, No. 25-CV-680, 2025 WL 2959310, at *3 (E.D.N.Y. Oct. 17, 2025) (finding an MCA not a loan where a reconciliation provision allowed "the Merchant to request reconciliation 'as many times . . . as it deems proper'" and "expressly excuse[d] the Merchant from performance in the event of bankruptcy"); *Womack v. Cap. Stack, LLC*, No. 18-CV-04192, 2019 WL 4142740, at *7 (S.D.N.Y. Aug. 30, 2019) (holding an agreement was not a loan where it "provides no liability if the seller ceases operations in the ordinary course of business"); *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, No. 16-CV-1545, 2019 WL 1473090, at *5 (E.D.N.Y. Apr. 3, 2019) (finding a transaction not a loan where "reconciliation is automatic, mandatory, and [leaves] no discretion for [the p]laintiff," though conceding "the security interest and guaranty that Plaintiff can enforce in the event Defendant

declares bankruptcy could suggest that the Agreement is a loan"); *Streamlined Consultants, Inc. v. EBF Holdings, LLC*, No. 21-CV-9528, 2022 WL 4368114, at *4–5 (S.D.N.Y. Sept. 20, 2022) (finding a transaction not a loan chiefly because the funder was "not absolutely entitled to repayment under all circumstances," and, inter alia, the reconciliation provision was mandatory and contingent only on "verification of the necessary information for reconciliation" (alterations adopted)); Dkt. No. 1-6 at 53, 56 (21-CV-9528 Dkt.) (attaching the agreement at issue in *Streamlined Consultants*, where the reconciliation window was longer than the Agreements here, the agreement in fact transferred "full and complete ownership" of the receivables and the buyer assumed the risk that "the full Purchased Amount may never be remitted because Seller's business went bankrupt," and the agreement lacked protections for the buyer in the seller's bankruptcy that are present here, like an exemption from a stay).  And the Court could conclude that a "true" sale of receivables, factoring transaction, or the like—for example, one that purchases a specific revenue stream, makes a good-faith effort to tie the payments on the advance to that revenue (or even assumes responsibility for collecting the receivables), seeks to recover the advanced sum if and as it comes in, and where the buyer bears the risk of the receivables failing to come in—is not a loan.

But here, the Court concludes Defendants' Counterclaims plausibly allege these Agreements, while cloaked in terminology suggestive of a purchase of receivables, are loans. *See, e.g.*, Raymond W. Burman, *Practical Aspects of Inventory and Receivables Financing*, 13 Law & Contemp. Probs. 555, 557 (1948) (describing "[t]he assignment of accounts receivable as collateral for borrowings [a]s an entirely different process, [that] necessarily results in far different considerations" from "the purchasing of accounts receivable"); Office of the Comptroller of the Currency, Accounts Receivable and Inventory Financing 6, 33 (Mar. 2000)

19

(distinguishing "the direct purchase, usually without recourse, of third-party . . . accounts receivable" where "[t]he [buyer] purchases the receivables at a discount, pays the company . . . what the third party owes [at a discount], and assumes all the credit risk for the purchased accounts," from "[a]sset-[b]ased [l]ending" where "[c]ollateral consists predominantly of accounts receivable and inventory"); *In re Burm*, 554 B.R. 5, 16 (Bankr. D. Mass. 2016) ("Courts have routinely held that a sale of accounts receivable at a discounted price, commonly referred to as factoring, is just that—a sale and not a loan subject to usury laws. . . . [B]ut the determination . . . requires a close look at the details of the transaction." (quotation marks omitted)) (collecting cases).  Consider the distinction articulated by the Second Circuit, an instructive example:

> Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor.  If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

*Endico Potatoes, Inc.*, 67 F.3d at 1069 (determining whether a transaction was a loan to resolve claims under federal statute and common law trust principles).  The former scenario, under *Adar Bays*, would not be a loan.  The latter—which more closely resembles this case—is.

And if they are loans, Plaintiff does not dispute that they would be usurious.  The effective interest rate calculation in the counterclaims is intuitive—take the difference between what Plaintiff gives Defendants and what Defendants are obligated to repay, divide it by the first amount, and annualize it based on the number of weeks in which the "advances" would be repaid.  The first Agreement funds Defendants $150,000 for a 16-week term and seeks $229,000 in repayment; the second funds Defendants $126,000 for a 15-week term and seeks $191,520 in

repayment; and the third funds Defendants $525,000 for a 23-week term and seeks $798,000 in repayment. (Defs.' Mem. 3.) Defendants' calculations—uncontested by Plaintiff—are that the effective annualized interest rates on each Agreement would be, respectively, 172%, 180%, and 118%, well in excess of the 25% limit in New York's criminal usury law. (*Id.*)

But this Counterclaim fails for an unrelated reason—New York's criminal usury laws do not create a private right of action. New York General Obligations Law § 5-521(1) prohibits any "corporation" from "interpos[ing] the defense of usury in any action." The same statute, however, provides that subsection (1) "shall not apply to any action in which a corporation interposes a defense of criminal usury." N.Y. Gen. Oblig. L. § 5-521(3). New York courts understand the first subsection to prevent corporations from asserting usury as an affirmative claim and understand the second subsection to only permit criminal usury as an affirmative defense, not a basis for a claim. *See Paycation Travel, Inc. v. Glob. Merchant Cash, Inc.*, 141 N.Y.S.3d 319, 319 (App. Div. 2021) ("§ 5-521 bars a corporation . . . from asserting usury in any action, except in the case of criminal usury as defined in Penal Law § 190.40, and then only as a defense to an action to recover repayment of a loan, and not as the basis for a cause of action asserted by the corporation for affirmative relief."); *Intima-Eighteen, Inc. v. A.H. Schreiber Co.*, 568 N.Y.S.2d 802, 803–04 (App. Div. 1991) ("[I]t is well established that the statute generally proscribes a corporation from using the usury laws either as a defense to payment of an obligation or, affirmatively, to set aside an agreement and recover the usurious premium.").

Defendants argue that these decisions are wrong as a matter of statutory interpretation. (Defs.' Mem. 18.) But no matter the strength of Defendants' argument, the Court cannot ignore the weight of state case law when it is interpreting state statutes, and Defendants have not pointed to any state court decision reaching a contrary result. *See Fletcher v. Atex, Inc.*, 156

21

F.R.D. 45, 52 n.6 (S.D.N.Y. 1994) ("In assessing the state of New York law, we must give

presumptive deference to clear statements of the law by intermediate state courts."); *see also*

*Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 199 (2d Cir. 2003) (noting federal

courts should "give proper regard to the decisions of a state's lower courts" on state law

questions (quotation marks omitted)).  Other courts in the Second Circuit have come to the same

conclusion.  *See, e.g.*, *Division 5, LLC v. Fora Financial Advance, LLC*, No. 24-CV-6870, 2024

WL 4663042, at *5 n.3 (S.D.N.Y. Nov. 4, 2024) (holding that while "the text of the laws does

not bar Plaintiff's strategy" of using criminal usury as the basis for an affirmative claim, "[a]s a

matter of common law, however, New York Courts have barred corporations from doing so"

(citing *Intima-Eighteen, Inc.*, 568 N.Y.S.2d at 804)), *vacated as moot*, 2025 WL 3172718

(S.D.N.Y. July 14, 2025).

Accordingly, while Defendants have adequately alleged the Agreements are loans with

interest rates in excess of 25%, there is no private right of action for criminal usury under New

York common law, so the Court must dismiss this counterclaim.[4]

### c.  Tortious Interference

Defendants claim Plaintiff's distribution of UCC liens to Defendants' customers

constituted tortious interference with Defendants' business relationships with those customers.

(*See* Am. Answer & Countercls. ¶¶ 99–109.)  "To prevail on a claim for tortious interference

with business relations, a party must prove: (1) that it had a business relationship with a third

party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3) that

the defendant acted solely out of malice or used improper or illegal means that amounted to a

---

[4] This conclusion does not necessarily compel the Court to dismiss the counterclaims that depend on a finding of criminal usury unless they are criminal usury claims in all but name, as the Court explains *infra* note 8.

crime or independent tort; and (4) that the defendant's interference caused injury to the relationship with the third party." *Stuart's, LLC v. Edelman*, 152 N.Y.S.3d 472, 476 (App. Div. 2021) (citing *106 N. Broadway, LLC v. Lawrence*, 137 N.Y.S.3d 148, 158 (App. Div. 2020)). Defendants plausibly allege each element.

First, Defendants allege they had business relationships with third parties—for example, each customer of theirs to whom Plaintiff circulated UCC liens. (*See, e.g.*, Am. Answer & Countercls. ¶¶ 100, 106 (referencing Defendants' clients); *id.*, Ex. D, at 2 (letter from United Max Kat Elite, LLC, terminating a contract in light of the UCC lien notice).) Plaintiff responds that Defendants "do not attach copies of the contracts that were allegedly interfered with," and "failed to identify a relevant contract." (Pl.'s Mem. 15.) But at this stage, Defendants need not attach a contract to make their allegations plausible—even in a breach of contract case, there is no such requirement. *See Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 637 (E.D.N.Y. 2018) (holding claimants in contract case did not need to attach the contract to the complaint at the motion to dismiss stage); *Demetres v. Zillow, Inc.*, No. 21-CV-802, 2022 WL 4367597, at *13 (D. Conn. Sept. 21, 2022) ("These allegations plausibly support a viable claim for tortious interference, and Plaintiff was not required to include proof at the motion to dismiss stage that actual contracts exist."). What they have alleged is enough—that they had business relationships, and with whom.[5]

Second, Defendants plausibly allege Plaintiff interfered with those relationships. Plaintiff circulated UCC lien notices to third parties with whom Defendants had relationships, "direct[ing]

---

[5] The Court notes Plaintiff's argument that Defendants did not sufficiently identify any business relationships or contracts—even though Plaintiff circulated UCC liens to specific customers of Defendants—further undermines their argument that these transactions were not loans. It is hardly credible that a buyer who purports to have purchased a seller's customer receivables would later claim the seller had no identifiable customer relationships.

some activities towards the third party," *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997). (*See* Am. Answer & Countercls. ¶¶ 100–104 (alleging Plaintiff sent lien notices to Defendants' clients that Plaintiff knew to be "false[]" in material respects).) Plaintiff's briefing does not contest that if Defendants did have the business relationships they claim, Plaintiff's conduct in attempting to extract money from Defendants' clients by asserting liens would amount to interference, *i.e.*, "direct[ing] [conduct] not at [Defendant] itself, but at the party with which [Defendant] has or seeks to have a relationship." *See Travelex Currency Servs., Inc. v. Puente Enters., Inc.*, 449 F. Supp. 3d 385, 401 (S.D.N.Y. 2020); *see also Eat It Corp. v. Keumkang B & F Co.*, No. 15-CV-4763, 2018 WL 1788146, at *2 (E.D.N.Y. Feb. 16, 2018) (holding communications to a party's customers, *inter alia*, satisfied the interference element of tortious interference) (report and recommendation).

Third, Defendants have adequately pled that Plaintiff's means of interference are illegal or improper. For example, Defendants have alleged the lien notices were either entirely false, because PMF had in fact "valid[ated] [to Defendants] that they had terminated the UCC filing that they attached in their notices to clients, but sent misleading notices anyway," (Am. Answer & Countercls. ¶ 104), or otherwise exaggerated the nature of Plaintiff's security interest, (*see, e.g.*, *id.* ¶ 100 ("PMF . . . falsely claim[ed] a priority lien despite knowing that another MCA company affiliated with PMF . . . had already filed UCC lien notices, and that there were other senior liens based on all the banking transactions reviewed before PMF funded Sonata.")). Drawing inferences in Defendants' favor, the Counterclaim states Plaintiff circulated lien notices that it knew exaggerated its security interest or that were attempting to enforce liens that had already been terminated, which is at least "improper." *See, e.g.*, *Neptune Estates, LLC v. Big Poll & Son Constr., LLC*, 961 N.Y.S.2d 896, 903 (Sup. Ct. 2013) ("[A] lienor that willfully

24

exaggerated a lien may be liable for . . . interference with contract (to extent such lien interferes with existing contracts) [or] interference with prospective business advantage (to extent such lien interferes with potential deals)[.]"); *see also In re Ditech Holding Corp.*, No. 19-10412, 2020 WL 3967897, at *14 (Bankr. S.D.N.Y. July 11, 2020) (holding a party "had no right to file [a] . . . [UCC] financing statement" where they did not hold a valid lien on the secured property). And if the underlying debt that the UCC lien notices would be a means of repaying is illegal, as Defendants have plausibly alleged it is under New York usury laws, then any attempts to collect on it are likewise plausibly illegal under a number of different theories even if the lien notices were accurate and legitimate.  *See, e.g.*, *LG Cap. Funding, LLC v. ExeLED Holdings Inc.*, No. 17-CV-4006, 2024 WL 1116082, at *18 (S.D.N.Y. Mar. 13, 2024) ("RICO makes it unlawful to collect an unlawful debt, including a debt that is: 'unenforceable by virtue of state or federal usury laws.'" (citing 18 U.S.C. §§ 1961(6) and 1963(c))); *Division 5, LLC*, 2024 WL 4663042, at *6 (holding that "efforts to collect an illegal debt through the statutory mechanism of UCC lien letters" would "create the very kind of loophole that the New York legislature sought to eliminate" by the criminal usury laws); *Raytman v. Jeffrey G. Lerman, P.C.*, No. 17-CV-9681, 2018 WL 5113952, at *6 (S.D.N.Y. Oct. 19, 2018) ("Collection of an invalid debt is inherently an unfair practice under [15 U.S.C.] § 1692f.").[6]

---

[6] Both statutes apply to unlawful attempts to collect a debt by foreclosing on a lien or security interest, including from a third party.  *See, e.g.*, *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 475 (2019) ("[N]othing in the primary definition [in the FDCPA] requires that payment on a debt come 'from a debtor.' The statute speaks simply of the 'collection of any debts . . . owed or due.'" (quoting 15 U.S.C. § 1692a(6))); *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148 (3d Cir. 2016) ("Nothing in RICO suggests that Congress intended to limit its prohibition on the 'collection of unlawful debt' to the seizure of cash [from the debtor] and to exclude the forfeiture of collateral used to secure unlawful debt.  Quite the opposite.").

Finally, Defendants have plausibly alleged Plaintiff's conduct injured them.  The counterclaims allege that Plaintiff's UCC liens contributed to clients' decisions to terminate their relationships with Defendants, amounting to more than $4 million in lost contracts.  (Am. Answer & Countercls. ¶¶ 100–01 (claiming the "UCC lien notices [sent] to [Defendants'] clients . . . directly caused the termination of [Defendants'] business contracts and business relationships valued at over $4.1 million," referencing exhibits that name two specific businesses with whom Defendants had a relationship.)  That harm satisfies the injury element for this tortious interference counterclaim.  *See, e.g.*, *Sinclair & Wilde, Ltd. v. Barer Holding Co.*, 792 F. Supp. 3d 521, 535 (S.D.N.Y. 2025) (finding the injury element of tortious interference with business relationships met due to, among other things, "prospective economic harm from the loss of the business relationship").

Accordingly, the counterclaims state a claim for tortious interference with business relationships, and the Motion to Dismiss is denied with respect to this counterclaim.

### d.  RICO

Defendants also allege that Plaintiff's conduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO").  (Am. Answer & Countercls. ¶¶ 110–125.)  "To prevail on their civil RICO claims in this case, [Defendants] must show '(1) a substantive RICO violation under [18 U.S.C.] § 1962; (2) injury to the plaintiff's business or property, and (3) that such injury was by reason of the substantive RICO violation.'"  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010)).  As to the first element, § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of

such enterprise's affairs through . . . collection of unlawful debt." 18 U.S.C. § 1962(c). "To state a claim [under RICO] based on the collection of an unlawful debt, [Defendants] must allege that (1) the debt was unenforceable in whole or in part because of state or federal laws relating to usury; (2) the debt was incurred in connection with the business of lending money at a usurious rate; and (3) the usurious rate was at least twice the enforceable rate." *Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 256 n.11 (S.D.N.Y. 2023) (citing *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 376 (S.D.N.Y. 2022)).

Defendants have plausibly stated each element. As a threshold matter, Defendants adequately plead the enterprise requirement against Plaintiff. Defendants allege Plaintiff, a corporation, worked with another closely related entity, True Business Funding ("TBF"), with whom Plaintiff "engaged in a coordinated scheme of fraudulent lending and unlawful debt collection," for example, by "coordinating contracts where Sonata was signed up with both entities through the same representatives," used "shared salespeople," and filed "parallel lawsuits [against Defendants], wherein PMF and TBF sued the Sonata Parties separately to mislead courts and fragment its defense." (Am. Answer & Countercls. ¶¶ 115–120.)[7] That suffices to allege an "enterprise" under RICO. *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345, 365 (E.D.N.Y. 2000) ("Multiple corporations or other legal entities can, when working in concert either overtly or covertly, form an association-in-fact RICO enterprise." (collecting cases)); *cf. United States v. Stolfi*, 889 F.2d 378, 380 (2d Cir. 1989) ("[E]ntities that

---

[7] Defendants may not establish the "enterprise" by alleging Plaintiff was in an enterprise consisting only of itself or its own employees. *See U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 206 (2d Cir. 2017) ("[A] plaintiff may not circumvent the distinctness requirement by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, that consists, in other words, of a corporate defendant corrupting itself." (quotation marks and citations omitted)).

are separate and distinct enterprises for some purposes may jointly be an enterprise for RICO purposes where they have been connected by a defendant's participation in them through a pattern of racketeering activity.").

As to the particular elements of an unlawful debt RICO claim, as explained above, Defendants have plausibly contended the Agreements are usurious loans under New York law, that Plaintiff is in the business of making such loans, and that the annualized rate—here, again, in excess of 100% for each of the Agreements—was more than double the enforceable rate, as even the criminally usurious rate is only 25%.  *Espire Ads LLC*, 655 F. Supp. 3d at 256 n.11. Defendants have also alleged injury to their business—in particular, they note terminated customer relationships and the "cycle of debt" the Agreements put them in, which culminated in Sonata's "collapse."  (Am. Answer & Countercls. ¶¶ 122, 124.)  Finally, that injury is sufficiently alleged to be downstream of the RICO violation—Defendants allege the Agreements contributed to their insolvency, and that Plaintiff's efforts to enforce them undermined Defendants' business relationships.  (*Id.* ¶ 124 ("PMF's fraudulent UCC notices and predatory lending practices directly led to [Defendants'] collapse.").)  Other courts in the Second Circuit have likewise found RICO claims plausible on similar facts.  *See, e.g.*, *Queen Funding, LLC*, 2022 WL 2829913, at *6 (denying a motion to dismiss as to a RICO claim concerning a purveyor of similar merchant cash advances, holding the "Complaint sufficiently and plausibly alleges collection of unlawful debt in violation of RICO"); *Cap. Merchant Servs., LLC*, 632 F. Supp. 3d at 450 (concluding "that Plaintiffs have pleaded a predicate RICO violation through a collection of an unlawful debt" where they alleged defendants' merchant cash advances were in fact usurious loans); *Haymount Urgent Care PC*, 609 F. Supp. 3d at 251 (relying on *Adar Bays*,

*inter alia*, to conclude defendants' merchant cash advances were usurious loans and denying motion to dismiss RICO counts).

Plaintiff's Motion to Dismiss is accordingly denied as to the RICO counterclaim.

### e. Unjust Enrichment

Defendants' fifth counterclaim is that Plaintiff unjustly enriched itself at Defendants' expense through the Agreements. (*See* Am. Answer & Countercls. ¶¶ 126–129.) "Unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties. . . . To recover under a theory of unjust enrichment, a litigant must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Columbia Memorial Hosp. v. Hinds*, 192 N.E.3d 1128, 1137 (N.Y. 2022) (citations and quotation marks omitted, alterations adopted). The gravamen of Defendants' argument is that the Agreements constituted a "predatory lending scheme" that "trapped [Defendants] in a cycle of debt." (*See* Am. Answer & Countercls. ¶¶ 127–128.)

This claim fails for two reasons. First, allowing this claim would end-run New York courts' bar on affirmative claims for usury. In New York, "[t]he existence of [a] valid, enforceable contract governing the subject matter . . . precludes any recovery based upon a theory of unjust enrichment." *Catlyn & Derzee, Inc. v. Amedore Land Devs., LLC*, 87 N.Y.S.3d 661, 664 (App. Div. 2018) (collecting cases). In this case, there are the three Agreements, which no Party disputes were properly formed contracts. The only reason there would *not* be a valid, enforceable contract is if the contract were void *ab initio* for criminal usury, which, as explained above, Defendants have plausibly alleged it is. But if Defendants could maintain an affirmative

29

claim here for unjust enrichment, New York's bar on affirmative usury claims would be meaningless.  Under Defendants' position, stymied by the Appellate Divisions' rulings in *Paycation* and *Intima-Eighteen* that a debtor of a criminally usurious loan cannot sue to recover their payments on that loan, debtors could simply invoke criminal usury to void the contract and sue in unjust enrichment.  This would allow criminal usury to operate "as the basis for a cause of action asserted by the corporation for affirmative relief," *Paycation Travel, Inc.*, 141 N.Y.S.3d at 320, and it cannot be the result New York courts intended in interpreting the criminal usury statute.  *Cf. Beburishvili v. United States*, No. 12-CV-5985, 2014 WL 3896085, at *2 (E.D.N.Y. Aug. 8, 2014) ("[P]laintiff cannot circumvent [a legal bar to his claim] merely by dressing up [the] claim as another cause of action that is not expressly barred[.]").[8]

The second reason this claim fails is that Defendants retained more of Plaintiff's "advance" than they paid back.  Defendants have, of course, alleged a variety of losses—for

---

[8] Unlike the unjust enrichment claim, the federal-law RICO claim does not end-run the New York state-law bar on affirmative claims for criminal usury.  Other courts in the Second Circuit have allowed RICO claims predicated on criminal usury to proceed notwithstanding the New York's bar on affirmative state-law usury claims.  *See, e.g.*, *Haymount Urgent Care PC*, 609 F. Supp. 3d at 246, 254 (denying a motion to dismiss RICO claims predicated on loans that constituted "criminal usury under New York law," but also noting New York courts "prohibit[] corporations from bringing affirmative claims or counterclaims alleging criminal usury and seeking to invalidate an agreement").  RICO claims have different elements from state-law unjust enrichment—which Defendants would have this Court treat as entirely overlapping with the criminal usury statute—and serve distinct "federal policies" that the state usury laws do not, *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1035 (2d Cir. 1992), taking aim at "a serious national problem for which public prosecutorial resources are deemed inaccurate," *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 151 (1987).  Likewise, at least one court in the Southern District has held that New York's bar on affirmative criminal usury claims does not bar an action targeting UCC liens operating as a security for a usurious loan.  *See Division 5, LLC*, 2024 WL 4663042, at *5 ("Allowing Division 5 to use the criminal usury law to void Fora's UCC liens fits well with this statutory scheme.  Division 5 has not sought to invalidate the underlying MCA agreement or to recover already-paid interest.  Rather, it wants to protect itself from future efforts to collect an illegal debt through the statutory mechanism of UCC lien letters. While . . . a UCC lien is not a legal action, it accomplishes the same end while allowing the issuer to bypass the courts.").

example, losses of business relationships and the long-term viability of their business—but the only loss that *Plaintiff retained*, thus the only loss Defendants can claw back in an action for restitution, is what Defendants paid them pursuant to the Agreements.  *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 534 (S.D.N.Y. 2011) ("[T]he measure of damages for an unjust enrichment claim is restricted to the 'reasonable value' of the benefit conferred upon the defendants.").  And those are far outweighed by what Plaintiff transferred to Defendants.  Because "restitution is appropriate when [the claimant's] loss is more than the [other's] gain," *Joe Hand Promotions, Inc. v. Nekos*, 18 F. Supp. 2d 214, 217 (N.D.N.Y. 1998) (citation omitted), and works to unwind a transaction by putting both parties in the position they were in beforehand, *see Ajettix Inc. v. Raub*, 804 N.Y.S.2d 580, 593 (Sup. Ct. 2005), Defendants stand to recover nothing on this claim.  *See also Exportaciones Del Futuro S.A. de C.V. v. Iconix Brand Grp. Inc.*, 636 F. Supp. 2d 223, 233 (S.D.N.Y. 2009) ("In [a quantum meruit] case where a defendant is a wrongdoer, a plaintiff can recover damages that would restore him to his former status.").

Accordingly, the Court grants the Motion to Dismiss as to the counterclaim for unjust enrichment.

### f.  Conversion

Defendants argue Plaintiff's withdrawal of funds from the agreed-on deposit account constituted conversion.  (Am. Answer & Countercls. ¶¶ 130–32.)  "In order to succeed on a cause of action to recover damages for conversion," Defendants "must show (1) legal ownership or an immediate right of possession to a specific identifiable thing and (2) that" Plaintiff "exercised an unauthorized dominion over the thing in question to the exclusion of" Defendants' rights.  *Giardini v. Settani*, 70 N.Y.S.3d 57, 58 (App. Div. 2018).

31

Here, Plaintiff does not contest that Defendants had a property interest in whatever money was in "Sonata's [i.e., Defendants'] accounts," (Am. Answer & Countercls. ¶ 132), in excess of Defendants' contractual obligation to Plaintiff. *See Newbro v. Freed*, 409 F. Supp. 2d 386, 395 (S.D.N.Y. 2006) ("The First Department has held that 'funds of a specific, named bank account are sufficiently identifiable' to support a conversion claim." (quoting *Rep. of Haiti v. Duvalier*, 626 N.Y.S.2d 472, 475 (App. Div. 1995))). And Defendants allege Plaintiff "double-withdr[ew] payments, t[ook] funds beyond agreed-upon amounts, and ignore[ed] [Defendants'] financial hardship," thereby dipping into the share of the funds that remained Defendants' property. (Am. Answer & Countercls. ¶ 131.) Drawing all reasonable inferences in Defendants' favor, allegations that Plaintiff made duplicative withdrawals and drew funds from the bank account beyond the payments authorized in the Agreements would state a claim for conversion. *See Newbro*, 409 F. Supp. 2d at 395 ("In New York, an unauthorized wire transfer from one bank account to another constitutes conversion."); *Bank of Am. Corp. v. Braga Lemgruber*, No. 02-CV-1041, 2007 WL 4548298, at *16 (S.D.N.Y. July 10, 2007) ("[T]here was specific money in . . . [the bank accounts] that Lembruger had no right to and improperly converted for his own use, supporting the claim for conversion."), *report and recommendation adopted in relevant part*, 2007 WL 4510329 (S.D.N.Y. Dec. 20, 2007). And Plaintiff's argument that "the withdrawal of the funds was expressly permitted by contract" is unresponsive to *these* allegations, concerning withdrawals that were *not* permitted by contract. (Pls.' Mem. 20.) The Court is reluctant to agree with Defendants' argument, however, that *any* withdrawal from Defendants' accounts *ipso facto* amounted to conversion because "the Agreements themselves were void due to their usurious nature, which would of course wipe out any right to withdraw as well." (Defs.' Mem. 26–27.) Like the unjust enrichment claim, this argument would end-run

New York state law's bar on asserting affirmative claims based on usury—any such claim could instead be brought as a state-law conversion claim to recover what was paid under a usurious agreement.

Accordingly, Plaintiff's Motion to Dismiss is denied as to the counterclaim for conversion.

### g.  GBL § 349

Defendants also argue Plaintiff's marketing practices violated New York General Business Law Section 349.  (Am. Answer & Countercls. ¶¶ 133–43.)  Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce in the furnishing of any service in" New York.  N.Y. GBL § 349.  To state a claim under § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012)).

The Court begins and ends with the first element.  Defendants must allege Plaintiff's conduct that injured them in this case was *consumer*-oriented, rather than oriented to businesses like Sonata and its principals.  The counterclaims are devoid of any such allegation—or allegations that Plaintiff engages in consumer-oriented conduct at all—and Defendants make no effort in their response to the Motion to Dismiss to contest this element.  (*See generally* Am. Answer & Countercls. ¶¶ 133–143; *id.* ¶ 141 ("PMF has repeatedly and persistently engaged in deceptive acts and practices in *its course of dealing with the Sonata Parties*." (emphasis added)); Pl.'s Mem. 20–21 ("Defendants have failed to allege that they are 'consumers' . . . . Plaintiff enters into agreements with [b]usinesses, and not consumers.").)  The GBL § 349 claims must

accordingly be dismissed.  *See Scarola v. Verizon Commc'ns, Inc.*, 45 N.Y.S.3d 464, 465 (App. Div. 2017) ("[T]he challenged conduct . . . was not consumer-oriented.  The account was a business, not a consumer, account.  Nor did defendant's conduct have 'a broader impact on consumers at large.'" (quoting *Oswego Labs. Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 744 (N.Y. 1995))); *Axiom Inv. Advisors, LLC ex rel. Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017) ("Transactions between businesses . . . that do not affect average consumers do not constitute consumer-oriented conduct." (collecting cases)).

Accordingly, because there is no allegation that any consumer-oriented conduct injured Defendants, the GBL § 349 counterclaim must be dismissed.

2.  Preliminary Injunction[9]

a.  Likelihood of Success on the Merits

"To establish a likelihood of success on the merits, a plaintiff need not show that success is an absolute certainty.  [It] need only make a showing that the probability of . . . prevailing is better than fifty percent."  *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quotation marks omitted) (citing *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)), *appeal dismissed as moot sub nom. Broker Genius Inc. v. Gainor*, 756 F. App'x 81 (2d Cir. 2019)).

While emphasizing this finding is only preliminary, *see Antonyuk v. James*, 120 F.4th 941, 1048 n.126 (2d Cir. 2024) ("A preliminary injunction is not a full merits decision, but rather

---

[9] To the extent the Court makes findings of fact and conclusions of law in determining whether a preliminary injunction should issue here, these determinations are all preliminary, not final, and made on a limited record.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").

addresses only the likelihood of success on the merits." (quotation marks and citation omitted)),

the Court finds Defendants have shown a likelihood of success on the merits.  First, "for the

reasons discussed *supra* in evaluating [Plaintiff's] motion to dismiss [the Counterclaims], the

Court finds a [sufficient] probability that [Defendants] will prevail on the merits [of at least some

of their Counterclaims] in this action."  *U.S. Bank Nat'l Ass'n as Tr. v. 1078 Whillmore LLC*,

740 F. Supp. 3d 157, 178 (E.D.N.Y. 2024).  The Counterclaims adequately plead claims for

conversion and tortious interference, and under RICO.  *See supra*.  The Court finds that at least

on the tortious interference and RICO claims, Defendants have not only stated plausible claims

but also established the requisite likelihood of success for the first factor of a preliminary

injunction.[10]

The Court begins with the tortious interference claims.  The Court relied on the terms of

the contract itself in concluding Defendants had plausibly alleged the Agreements were usurious

loans, *see supra*, and the Parties do not dispute their contents or authenticity, so the Court finds

them authentic.  *See Fashion Leaf Garment Co. Ltd. v. Essentials N.Y. Apparel, LLC*, No. 19-

CV-03381, 2024 WL 1348655, at *4 (S.D.N.Y. Mar. 29, 2024) ("The parties do not dispute the

authenticity or accuracy of these purchase orders.  Thus, the Court treats the two purchase orders

. . . as evidence of the existence of valid contracts between the two parties." (quotation marks

and citation omitted)).  The Court also considers Defendants' declarations, which provide clear

---

[10] While the Counterclaims state a plausible claim for conversion, see *supra*, there is nothing on the record as to what Plaintiff actually withdrew from Defendants' bank accounts and whether those withdrawals were, in fact, "beyond [the] agreed-upon amounts" or if Plaintiff "double-withdrew" payments.  (Am. Answer & Countercls. ¶ 131.)  The Court thus cannot make a determination as to Defendants' likelihood of success on the merits of these claims.  *See Beal v. Stern*, 184 F.3d 117, 129 (2d Cir. 1999) ("Thus, in light of the paucity of the evidence in the record on this matter, we cannot say that plaintiffs have shown a clear likelihood of success on the merits.").

support for their allegations that circulating the liens constituted tortious interference.  For example, Defendants attest that "Aggieland owed [Defendants] nothing" when the first lien notice was sent to them, and although Defendants communicated this to Plaintiff, Plaintiff continued asserting UCC lien notices against Aggieland; as explained above, circulating a false or exaggerated lien notice to Defendants' customers can constitute the interference element of tortious interference.  (Supp. Decl. of George Atala ¶ 19–20; *id.* Ex. D, at 1).  Therefore, even if the loans were *not* usurious, there is a sufficient likelihood of success on the merits because the Court preliminarily finds the lien notices were exaggerated or false; and if the loans *are* usurious, the likelihood of success on the merits is even stronger because any lien notice circulated to collect on an criminally usurious debt may be an "improper," *i.e.*, tortious, action taken to interfere with a business relationship.

For similar reasons, Defendants have made a sufficient showing of their likelihood of success on their RICO claims.  First, they have shown that Plaintiff is part of an enterprise for RICO's purposes, along with at least TBF and Mason Kashat, a principal of PMF.  (*See, e.g.*, Supp. Decl. of George Atala ¶ 20 ("My communications with PMF's manager, Mason Kashat, repeatedly referenced discussions he was having with TBF about my account, and the payment demands he conveyed to me involved both PMF and TBF in tandem."); *id.*, Ex. E, at 1 (including screenshots of text messages from Mason Kashat, a principal at PMF, discussing dealings with TBF and seeking payment from Defendants on TBF's behalf).)[11]  They have also shown they are likely to win their argument that the debt is unlawful, as already discussed.

---

[11] The Court finds this affidavit, in combination with the documentary evidence of communications from Kashat, more persuasive of PMF's dealings with TBF than Kashat's comparatively conclusory declaration that "Plaintiff is not affiliated with [TBF] in any way with respect to any transaction entered into by either TBF or Plaintiff and the Defendants," which is not responsive to the evidence Defendants have adduced.  (Decl. of Mason Kashat ¶ 3 (Dkt. No.

Defendants have accordingly established a sufficient likelihood of success to satisfy this element of the test for a preliminary injunction.

### b. Irreparable Harm

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation marks omitted). The "standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). Since it is "an extraordinary remedy," preliminary injunctive relief should not be issued "based only on a possibility of irreparable harm." *Id.* Further, irreparable harm "is neither remote nor speculative, but actual and imminent." *Faiveley Transp.*, 559 F.3d at 118; *see also Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) ("The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and cannot be remedied by an award of monetary damages." (quotation marks omitted)).

The Court finds Defendants have "met [their] burden of establishing the requisite likelihood of irreparable harm in the absence of injunctive relief." *New York by James v. Red Rose Rescue*, 705 F. Supp. 3d 104, 120 (S.D.N.Y. 2023). Defendants argue Plaintiff's "new UCC filings" will "threaten additional contract cancellations, reputational harm, and destruction of client relationships," which are "not compensable by money damages alone." (Mem. in Supp.

---

39-2).) If anything, Kashat's declaration strengthens the conclusion that TBF and PMF constituted an "enterprise" because it allows the Court to find the two are distinct entities. *See Lavastone Cap. LLC v. Coventry First LLC*, No. 14-CV-7139, 2015 WL 1939711, at *6 (S.D.N.Y. Apr. 22, 2015) ("[W]ith regard to the corporate defendants, if they are separate and distinct corporations that do not otherwise operate as part of a single, unified corporate structure, they may individually be RICO 'persons' and still together comprise part of the RICO 'enterprise' that is alleged to have its own ongoing structure and purpose.").

of O.S.C. 4 (Dkt. No. 25).) Contract cancellations alone in Defendants' business may be compensable by money damages, however, and Defendants do not explain why any harm therefrom is irreparable here—the Parties can estimate what Defendant may have lost in profits from those cancellations, for example. *See, e.g.*, *Cooney v. Consol. Edison Co. of New York, Inc.*, No. 03-CV-0869, 2003 WL 22093483, at *3 (S.D.N.Y. Sept. 10, 2003) ("Thus, a party seeking injunctive relief who alleges only loss of earnings and other related harms fails to establish irreparable injury because a harm that can be remedied by payment of damages is not irreparable." (quotation marks omitted)); *PRN Pharms. v. Managed Prescription Network*, 933 F. Supp. 234, 236 (W.D.N.Y. 1996) ("Where the gravamen of an action is the allegedly improper termination of an agreement giving rise to a breach of contract, there is no irreparable injury if the plaintiff could be fully compensated by money damages."). But the destruction of client relationships can be an irreparable harm, *see Singas Famous Pizza Brands Corp. v. N.Y. Advert LLC*, 468 F. App'x 43, 46 (2d Cir. 2012) (summary order) ("[L]oss of client relationships and customer good will built up over the years constitutes irreparable harm for purposes of imposing a preliminary injunction." (internal quotation marks and citations omitted)), as can reputational harms, *see Regeneron Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 39–40 (S.D.N.Y. 2020) ("A court can find irreparable harm based on 'loss of reputation, good will, and business opportunities . . . because these damages are 'difficult to establish and measure.'" (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004))). *See also Gov't Emps. Ins. Co. v. Patel*, 166 F.4th 280, 293 n.6 (2d Cir. 2026) (recognizing "loss accompanied by other intangible harms may constitute irreparable harm" and citing cases involving loss of client relationships, reputation, and good will). And "courts in this [d]istrict have found that asset freezes imposed by defendants in MCA cases which threaten a

plaintiff's business with collapse show irreparable harm." *Stellar Beach Rentals, LLC v. Redstone Advance, Inc.*, No. 23-CV-955, 2023 WL 4421809, at *3 (S.D.N.Y. 2023).

In their initial exhibits, Defendants referred the Court to one letter from a client terminating their relationship in light of, *inter alia*, Plaintiff's UCC liens. (*See* Am. Answer & Countercls., Ex. D, at 2.) To merit a preliminary injunction, however, the asserted harm must be *prospective*—if the harm has happened and injunctive relief cannot change that, then the irreparable harm element is unmet. *See Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) ("The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred." (emphasis in original)). Defendants' only other initial submission going to the risks to their business relationships was a letter from another client "inquir[ing] about the stability of Sonata Construction as our two businesses . . . pursue multiple projects together," which is too speculative to qualify as an imminent irreparable harm—there is no way to anticipate the result of the "inquir[y]," and the letter seems to indicate a persisting intent to "pursue multiple projects" with Defendants. (Am. Answer & Countercls., Ex. E, at 2.) Most fatal at the time of Defendants' initial submissions was their declaration describing their business as having "no clients, no projects, no income," and as "insolvent and non-operational." (Supp Br. On Bond, Ex. 34-1 ¶¶ 2–7 (Dkt. No. 34).) Without any business to maintain business relationships in the first place, these purported irreparable harms would be entirely moot. *See J.P.T. Automotive, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 659 F. Supp. 2d 350, 355 (E.D.N.Y. 2009) ("[B]ecause Plaintiff is no longer a viable business entity, it will not suffer irreparable harm from the denial of a preliminary injunction." (quotation marks and citation omitted)).)

39

At the November 17, 2025 hearing on Defendants' Motion for a Preliminary Injunction, the Court asked Defendants to submit additional papers attesting to irreparable harm. (*See* Supp. Decl. of George Atala ¶ 1.) Defendants did so. (*Id.*) And their new submissions lead this Court to find Defendants would face irreparable harm in the absence of injunctive relief. Atala, the individual Defendant, is "actively trying to rebuild Sonata," the corporate Defendant, "took concrete steps to do so, and incurred real financial obligations to make it possible." (*Id.* ¶ 11.) While Sonata had previously forfeited its Texas business license due to its inability to pay taxes, Atala was able to "reinstate the company" by having a friend "pa[y] the outstanding Texas franchise taxes," after which "the Texas Comptroller issued a Tax Clearance Letter" and the "Texas Secretary of State officially reinstated Sonata to active status." (*Id.* ¶¶ 8–10.) After Sonata's reinstatement, "[a] former client, Aggieland Outfitters, contacted [Defendants] about multiple new construction projects," giving Defendants a "meaningful chance to restore income and restart operations." (*Id.* ¶ 6.)[12] While Defendants were working with this client, however, Plaintiff "sent a second round of UCC lien notices on September 18, 2025," including to that client, which "frightened" the client, "eliminat[ing] the only substantial opportunity [Defendants] had to resume operations and earn income." (*Id.* ¶¶ 12–15.) "If PMF is permitted to continue

---

[12] Plaintiff contends it did not send any UCC lien notices to Aggieland Outfitters. (Decl. of Ariel Bouskila 2 (Dkt. No. 39).) However, the very first lien notice attached to this declaration was sent from Premium Merchant Funding to "303A PROPERTIES LLC c/o FADI J KALAOUZE" (*see* Decl. of Ariel Bouskila, Ex. A, at 2 (Dkt. No. 39)), and Defendants point out that Kalaouze is the "principal of Aggieland Outfitters," (*see* Letter from Hillel Parness to Court (dated Dec. 10, 2025) (Dkt. No. 40)). *See Aggieland Outfitters*, Visit College Station, https://visit.cstx.gov/directory/aggieland-outfitters/ [https://perma.cc/7KWE-9KGE] (last accessed Feb. 17, 2026) (describing Aggieland Outfitters as founded and operated by Kalaouze); *Volpe v. Am. Language Commc'ns Ctr., Inc.*, 200 F. Supp. 3d 428, 431 n.1 (S.D.N.Y. 2016) ("Courts routinely take judicial notice of . . . official government websites."). The Court therefore finds Plaintiff did send the UCC lien notice Defendants described in their post-hearing briefing.

sending UCC notices," Defendants claim, "this pattern will repeat itself every time [Defendants] attempt to secure new work." (*Id.* ¶ 17.) The Court agrees this amounts to a showing of irreparable *prospective* harm that injunctive relief would remedy—Defendants attest they have reinstated and are aiming to resuscitate their business, and each new attempt is stifled by another lien notice to another customer to repay an unlawful debt. *See Amato v. Elicker*, 460 F. Supp. 3d 202, 215 (D. Conn. 2020) ("Courts have found irreparable harm when plaintiffs allege that their business would be shut down entirely if relief is not granted." (collecting cases)); *Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1035–36 (N.D. Cal. 2009) (agreeing with plaintiff's argument that irreparable harm element is satisfied where, though "irreparable harm has already occurred, . . . further irreparable harm is imminent absent an injunction").

Accordingly, Defendants have shown irreparable harm if an injunction does not issue.

### c.  Balance of Equities

The balance of hardships here tilts towards Defendants. "While [Defendants] will suffer a hardship in the absence of a preliminary injunction" as explained above, "[Plaintiff] will also suffer a hardship if a preliminary injunction is entered" because it will not be able to collect on their purported cash advance. *Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F. Supp. 3d 244, 260 (N.D.N.Y. 2015). However, while "the granting of an injunction may impose hardship on" Plaintiff, "the failure to grant relief would impose a greater hardship" on Defendants than granting relief would impose on Plaintiff. *Estee Lauder, Inc. v. Watsky*, 323 F. Supp. 1064, 1068 (S.D.N.Y. 1970).

Here, Defendants' hardships are manifestly clear. "Atala has no employment income, and total bank account balances across all personal and business accounts are under $50 . . . . All of Sonata's properties have been sent to foreclosure and some have already been liquidated by its

secured lenders." (Supp. Br. On Bond 2.) The possibility of recovering *anything* from receivables that Plaintiff is laying a claim to would accordingly be very meaningful to Defendants. Plaintiff, meanwhile, argues it would be an inappropriate windfall to Defendants to allow them to keep the balance of the loan—even irrespective of the outstanding "interest," Defendants received far more from Plaintiff than they paid back to Plaintiff. (*See* Opp. to Mot. for Prelim. Inj. 2 (Dkt. No. 35) ("Defendants received what they bargained for—a significant and immediate infusion of working capital that they could not obtain elsewhere[.]").) Accordingly, the brunt of the loss would sit with Plaintiff. The balance of hardships nevertheless tilts towards Defendants. If Plaintiff is unable to collect on the MCAs, their business carries on (and if they bore the risk on the MCAs, as they argue, then that is a possibility they were prepared for); if Defendants' customers continue receiving lien notices, then Defendants have shown it is likely their business will remain insolvent.

The balance of hardships is accordingly in Defendants' favor.

### d. Public Interest

As to the final element, the Court finds a preliminary injunction here is in the public interest. "The public interest is clearly served by enforcing statutes designed to protect the public . . . [and] New York's usury laws fall into this category. . . . The public interest factor therefore weighs in [Defendants'] favor." *Division 5, LLC*, 2024 WL 4663042, at *6 (quotation marks omitted) (citing *Stellar Beach Rentals, LLC*, 2023 WL 4421809, at *3). "[T]he public interest is [also] clearly served by enforcing statutes designed to protect the public, such as RICO," *Google LLC v. Starovikov*, No. 21-CV-10260, 2021 WL 6754263, at *4 (S.D.N.Y. Dec. 16, 2021), and Defendants have brought counterclaims under that law.

42

Accordingly, with each of the four factors tilting in Defendants' favor, the Court issues a preliminary injunction against Plaintiff, the terms of which the Court addresses in detail in the Conclusion.

### e. Bond

Finally, Plaintiff urges that if the Court does impose a preliminary injunction, it also must require Defendants to post a bond. (*See* Opp. to Mot. for Prelim. Inj. 21.)  "The court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  "Though the Rule appears mandatory, an exception to the bond requirement has been crafted for cases involving the enforcement of 'public interests,'" which courts have understood to comprise statutory schemes from "federal health and welfare statute[s]" to "New York's No-Fault insurance statutes."  *Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*, 435 F. Supp. 3d 443, 456 (E.D.N.Y. 2020) (citing *Pharm. Soc'y of State of New York, Inc. v. New York State Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995)).

For the same reasons this Court finds an injunction would be in the public interest, the Court concludes that situating New York's usury laws in the category of "cases involving the enforcement of 'public interests'" is appropriate.  *Gov't Emps. Ins. Co.*, 435 F. Supp. 3d at 456; *see Hammelburger v. Foursome Inn Corp.*, 437 N.Y.S.2d 356, 359 (App. Div. 1980) ("It is not difficult to ascertain that the criminal usury statutes fall within the class of rules created for the protection of society as a whole. . . . [The] right to be protected from criminally usurious loans . . . exists for the benefit of everyone."); *see also Division 5, LLC*, 2024 WL 4663042, at *6 ("The public interest is clearly served by enforcing statutes designed to protect the public . . .

[and] New York's usury laws fall into this category."); *Post v. President of the Bank of Utica*, 7 Hill 391, 413 (N.Y. 1844) ("These laws have not only defined usury, but have denounced it as inimical to the public welfare, and it is the duty of the courts to see that they are faithfully enforced."). The Court also finds an injunction will not prejudice Plaintiff—it already asserted UCC liens by the time this Action was initiated which this Court does not invalidate in the following Order, and faces little prospect of recovering against Defendants themselves, considering their financial hardship. (*See* Supp. Br. on Bond, Ex. 34-1, at 1–2.) *See Gov't Emps. Ins. Co. v. Tenenbaum*, No. 22-CV-4543, 2023 WL 2734744, at *3 (E.D.N.Y. Mar. 31, 2023) ("Because the preliminary injunction will not prejudice defendant LCC and this case involves the enforcement of public interests, I exercise my discretion to waive the bond requirement.").

The Court therefore exercises its "wide discretion" in setting a preliminary injunction bond, *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004), and grants Defendants' request to set the bond at a nominal $100.

### III.  Conclusion

The Court grants Defendants' Motion for a Preliminary Injunction. The terms of the injunction are as follows:

- Plaintiff is restrained and enjoined from filing any new UCC financing statements, lien notices, or similar encumbrances against Defendants or Defendants' clients, vendors, or business partners in connection with the Agreements at issue in this case;

- Plaintiff is restrained and enjoined from sending lien notices, collection letters, or communications to Defendants' customers or counterparties that purport to assert

44

security interests, debts, or payment redirection obligations arising from the

Agreements at issue in this case;

- Plaintiff is directed to withdraw any UCC lien notices sent and terminate any

    UCC financing statements filed against Defendants' clients in connection with the

    Agreements at issue in this case since the removal of the Action to this Court on

    February 6, 2025.[13]

The Court also grants Plaintiff's Motion to Dismiss as to Defendants' Counterclaims for

fraudulent inducement, criminal usury, unjust enrichment, deceptive trade practices, and

common law fraud, but denies it as to Defendants' Counterclaims under RICO and for tortious

---

[13] While this requires Plaintiff to take an affirmative action, that does not make this a mandatory preliminary injunction, and accordingly does not require Defendants to make a "clear showing that the moving party is entitled to the relief requested, or [that] extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (citation omitted).  "[I]t is long settled that the '[s]tatus quo to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy.'" *XL Specialty Ins. Co. v. Level Glob. Invs., L.P.*, 874 F. Supp. 2d 263, 272 (S.D.N.Y. 2012) (quoting *LaRouche v. Kezer*, 20 F.3d 68, 74 n. 7 (2d Cir. 1994)) (alteration in original); *see also Asa v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 243 (W.D.N.Y. Dec. 2, 2010) ("[T]he court's task when granting a preliminary injunction is generally to restore, and preserve, the status quo ante, *i.e.*, the situation that existed between the parties immediately prior to the events that precipitated the dispute.").  From the Counterclaims and Declarations, that last "uncontested status" is after Defendants agreed to allow Plaintiff to file the financing statements, (*see* Sept. Agreement 12–13), but before Plaintiff circulated the lien notices starting January 22, 2025, (*see* Am. Answer & Countercls. ¶ 107), because Defendants and Plaintiff had already begun disputing Defendants' obligations by then, (*see id.* ¶¶ 71–73 (explaining Defendants' efforts to restructure their debt and resolve their dispute and Plaintiff's rejection of those efforts); Compl. 6 (complaint filed in state court January 15, 2025, before first UCC lien notice circulated)).  *See Asa*, 757 F. Supp. at 243 (crafting injunction to restore status quo before litigation, but once contractual relationship "was abruptly terminated").  Here, Defendants ask only for the withdrawal and termination of lien notices and financing statements sent since removal on February 6, 2025, rather than a complete return to the status quo before the dispute began.  (*See* Proposed O.S.C. 2.)  Because this relief would not go beyond the "status quo . . . measured as of" the Parties' last "peaceable uncontested status," the injunction sought need only meet the ordinary preliminary injunction factors.  *XL Specialty Ins. Co.*, 874 F. Supp. 2d at 272 (quotation marks omitted).

interference and conversion to the extent the conversion counterclaim is premised on withdrawals unauthorized by the Agreements.  The Court denies leave to amend the Counterclaims because Defendants amended the Counterclaims after Plaintiff's first pre-motion letter, (Dkt. No. 7), and Plaintiff's second pre-motion letter, (Dkt. No. 13), sufficed to give Defendants notice of any deficiencies in the Counterclaims.  *See Leake v. Garden City Union Free Sch. Dist. Bd. of Educ.*, No. 23-CV-4243, 2024 WL 3252515, at *5 (E.D.N.Y. July 1, 2024) ("Because plaintiff already amended his complaint to address the deficiencies identified in the school district's pre-motion conference letter, plaintiff is denied further leave to amend.").  The Clerk of Court is respectfully directed to terminate the pending motions (Dkt. Nos. 18, 26).

SO ORDERED.

DATED:      March 30, 2026
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE